UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

HOSEY COLBERT, ET AL.                                        CIVIL ACTION

VERSUS

CITY OF BATON ROUGE/
PARISH OF EAST BATON ROUGE, ET AL.          NO.: 17-00028-BAJ-RLB

## RULING AND ORDER

Before the Court is the **Motion to Dismiss (Doc. 61)** filed by Defendants, Sid

J. Gautreaux, III, Sheriff of East Baton Rouge Parish ("Sheriff Gautreaux") and

Dennis Grimes, Warden of East Baton Rouge Parish Prison ("Warden Grimes"); the

**Motion to Dismiss (Doc. 43)** filed by Defendants, City of Baton Rouge/Parish of

East Baton Rouge ("EBR"), Prison Medical Services ("PMS"), and Rintha Simpson,

Interim Director of Prison Medical Services ("Director Simpson"); and the **Motion to**

**Dismiss (Doc. 56)** filed by Defendants, Sargent S. Grant ("Sargent Grant") and

Sargent J. Cage ("Sargent Cage"). All Defendants seek the dismissal of claims

brought by Plaintiffs, Hosey Colbert and Shantita Colbert ("Plaintiffs") under Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Plaintiffs filed an Opposition to each Motion to Dismiss. (Docs. 58, 59, 63).

Sheriff Gautreaux and Warden Grimes filed a Reply Memorandum. (Doc. 70).

Sargent Grant and Sargent Cage also filed a Reply Memorandum. (Doc. 66). The

Court has jurisdiction under 28 U.S.C. § 1331. Oral argument is not necessary.

1

For the following reasons, the **Motion to Dismiss (Doc. 61)** filed by Sheriff Gautreaux and Warden Grimes is **GRANTED IN PART** and **DENIED IN PART**. The **Motion to Dismiss (Doc. 43)** filed by EBR, PMS, and Director Simpson is **GRANTED IN PART** and **DENIED IN PART**. The **Motion to Dismiss (Doc. 56)** filed by Sargent Grant and Sargent Cage is **GRANTED.**

## I.    BACKGROUND

Plaintiffs Hosey Colbert and Shantita Colbert are the parents of Tyrin Colbert ("Colbert"), their 17 year old son, who was murdered by an inmate while incarcerated as a pretrial detainee at the East Baton Rouge Parish Prison ("EBRPP"). (Doc. 40 at p. 1). On January 12, 2017, Plaintiffs brought suit against, *inter alia*, EBR, which is the political entity responsible for funding operations and maintenance of the prison; Sheriff Gautreaux, who is responsible for running the prison; Warden Grimes, who is responsible for the day-to-day operation of the prison; PMS, which is the entity responsible for administering healthcare to the inmates; Rintha Simpson, who is the Interim Director of PMS; and "J. Does," who are unknown sheriff's deputies and PMS staff. (Doc. 1 at ¶¶ 3–9).

On August 14, 2017, Plaintiffs filed a superseding First Amended Complaint ("Complaint") adding additional claims and Defendants in place of "J. Does." (Doc. 40). The additional Defendants included Dr. Charles Bridges, who is the EBRPP Medical Director; Dr. Robert Blanche, who is the psychiatrist for the mental health program at EBRPP; as well as, Sargent Grant and Sargent Cage, who are employees of the East Baton Rouge Sheriff's Office. (Doc. 40 at ¶¶ 8–11).

2

Plaintiffs allege that Defendants were, and continue to be, deliberately indifferent to the serious medical and mental health needs of prisoners in the EBRPP generally, and towards Colbert individually, which resulted in Colbert's death. (*Id.* at p. 1). Plaintiffs further allege that Defendants' "explicit and *de facto* policies and practices" violated Colbert's right to be free from punishment without due process of law under the Fourteenth Amendment and 42 U.S.C. § 1983. (*Id.* at p. 2). Plaintiffs bring § 1983 violations against all Defendants all in their official capacities, and against Sheriff Gautreaux, Warden Grimes, Sargent Grant, and Sargent Cage in their individual capacities. (Doc. 40 at ¶¶ 88–111). Plaintiffs also allege violations of state law. (*Id.* at ¶¶ 115–28).

### A. Tyrin Colbert's Death

Plaintiffs allege that on or about November 6, 2015, Colbert was arrested at his school. (Doc. 40 at ¶ 13). On November 10, 2015, Colbert allegedly reported feeling suicidal and was placed on suicide watch, where he was housed in Unit II's M01 and N01 wings.[1] (*Id.* at ¶ 16). Three days later, Colbert reported hearing voices and having hallucinations, and he communicated to Defendant PMS staff that he needed help. (*Id.* at ¶ 18). Plaintiffs assert that on the same day, Defendant Dr. Blanche assessed Colbert "through the bars of [Colbert's] cell," and determined that Colbert was neither suicidal nor depressed and that he was manipulating prison staff. (*Id.* at

---

[1] According to Plaintiffs, EBRPP prisoners placed on suicide watch are housed in Unit II's M01 and N01 wings. Allegedly, M01 are single cells, and prisoners housed there receive no recreation or personal visits. In addition, Plaintiffs assert that M01 prisoners are locked in their cell for over twenty-three and a half hours a day. (Doc. 40 at ¶ 17).

¶ 19). Dr. Blanche then allegedly ordered that the suicide watch be discontinued. (*Id.*).

Additionally, in November, an EBRPP deputy reportedly found Colbert rocking back and forth, talking to the wall, and shaking in his cell on the juvenile wing. (*Id.* at ¶ 22). Colbert allegedly had not been sleeping, and Dr. Blanche reportedly noted that Colbert "may be responding to internal stimuli," that he seemed "very anxious," and that he had an "imaginary friend." (*Id.* at ¶ 23). However, Dr. Blanche was purportedly unsure whether Colbert was "psychotic" or "malingering." (*Id.* at ¶ 23).

In all alleged instances, Dr. Blanche allegedly conducted his assessments "through the bars of [Colbert's] cell." (*Id.* at ¶¶ 22–25). Plaintiffs assert that Dr. Blanche prescribed Colbert a number of psychotropic medications, such as "Ativan and Haldol."[2] (*Id.* at ¶¶ 23–24). On November 25, 2015, Colbert reported to PMS staff that he had been sexually assaulted by another prisoner. (*Id.* at ¶ 26).

On December 6, 2015, Plaintiffs claim that while Colbert was housed in Unit II's M01 cellblock, an EBRPP deputy observed Colbert put his arm into the cell and "then [he] started screaming and struggling to pull his arm out of the cell." (*Id.* at ¶ 28). Allegedly, an x-ray two days later revealed that Colbert's forearm was broken, and three days later, on December 11, 2015, Colbert was transported to the hospital. (*Id.* at ¶ 28). The hospital purportedly required Colbert to follow up with the physician within 2–3 weeks, but no follow up appointment was made and Colbert "never saw the [physician] again." (*Id.* at ¶ 30). Plaintiffs assert that Colbert was not

---

[2] Ativan is a drug used to treat anxiety, and Haldol is an antipsychotic drug used to treat psychotic disorders. (Doc. 40 at ¶ 24).

transported to any "scheduled medical call outs" within EBRPP that occurred on December 14 and 28, 2015, and January 4, 6, and 11, 2016. (*Id.* at ¶ 31).

On January 23, 2017, Colbert allegedly expressed to an EBRPP deputy that he wanted to kill himself, prompting the deputy to bring Colbert to PMS staff. (*Id.* at ¶ 33). Plaintiffs claim that when Defendant PMS staff spoke with Colbert, he "stared" and did not respond, prompting PMS to strip Colbert of his clothes, handcuff and shackle him, and place him in a paper gown, at which point Colbert purportedly "threw himself to the floor and bloodied his mouth" causing him to be "placed on lockdown." (*Id.* at ¶ 33).

On January 28, 2017, after Colbert was taken off suicide watch, the EBRPP security staff placed Colbert in a two-person cell on the juvenile wing with another 17 year old male, Kermitious Thomas ("Thomas").[3] (*Id.* at ¶ 35–36). Plaintiffs allege that on February 17, 2016, Thomas murdered Colbert, and was later convicted of the murder. (*Id.* at ¶¶ 37–38). According to Plaintiffs, no EBRPP security staff was assigned to monitor the juvenile wing on February 17, 2016, and Defendants Sargent Grant and Sargent Cage did not ensure that the wing was adequately monitored. (*Id.* at ¶ 41). Plaintiffs further assert that other detainees on the unit with Colbert and Thomas heard the two "fighting and yelling," and that Colbert yelled "I'm sorry" and "I give up." (*Id.* at ¶ 42). When EBRPP staff checked on Colbert, he was found

---

[3] On December 18, 2015, Plaintiffs assert that Thomas was arrested for carrying a handgun in a Gun Free Zone, resisting arrest, and illegal possession of a handgun by a juvenile. On December 29, 2015, while out on bond, Plaintiffs assert that Thomas was arrested for breaking into an apartment. Thomas has allegedly been in EBRPP since December 29, 2015. (Doc. 40 at ¶ 39).

unresponsive, face down, with a blanket around his neck. (*Id.* at ¶ 43). Colbert was transported to a hospital and died the next day. (*Id.*).

## B. Medical and Mental Health Care at the EBRPP

Defendant EBR contracted with Health Management Associates ("HMA") "to provide an assessment of the clinical operations and medical services being provided by the City Parish at the [EBRPP]." (Doc. 40 at ¶ 45). According to Plaintiffs, the authors of the HMA study interviewed Baton Rouge officials, including Defendants Director Simpson, Warden Grimes, Dr. Blanche, and Dr. Bridges. (*Id.* at ¶ 46). The site visit and tour of EBRPP and interviews took place in February of 2016, and the findings and recommendations were presented publicly to the Metro Council on June 8, 2016. (*Id.* at ¶ 46).

HMA found that Defendant EBR underfunds the medical, mental health, and dental care program at the EBRPP. (*Id.* at ¶ 47). HMA recommended that, given the average daily population of prisoners in the EBRPP, the budget should be doubled—from the current $5 million a year to almost $10 million. (*Id.* at ¶ 47). Additionally, HMA found that the EBRPP "is not adequately staffed by health care providers to address the health care needs of the population detained at the facility." (*Id.* at ¶ 48). HMA further found, *inter alia*, that the two infirmary rooms were "infirmaries' in name only" as they were inadequate and not within sightlines, inmates were required to make multiple delayed requests for health care, M01 and N01 provided a "woefully inadequate physical environment for the most unstable mentally ill" in the prison,

and there "is no [mental health] programming done at" EBRPP . . . "due to inadequate staffing and lack of available group rooms." (*Id.* at ¶¶ 50, 52, 54, 58).

## C. Systems and Policies at the EBRPP

Plaintiffs aver that as a result of both "explicit and *de facto* policies and practices" that allow suicidal and mentally ill prisoners to be housed in solitary confinement, such policies not only denies necessary treatment, but they also exacerbate the prisoners' condition and causes unnecessary pain and suffering; especially for adolescents like Colbert. (Doc. 40 at ¶ 76).

According to Plaintiffs, the failures of all Defendants are well known and consistent with a pattern and practice. (*Id.* at ¶ 80). Plaintiffs' Complaint included the following examples:

    a. Since 2013, at least four people died at the jail due to inadequate medical and mental health care;

    b. In February of 2015, Defendant GRIMES publically acknowledged that cell doors in the EBRPP do not open and shut due to rust, the layout of the prison makes it difficult to monitor prisoners, and overpopulation requires sending hundreds of prisoners to other parishes;

    c. In October of 2015, a Baton Rouge elected official complained of a study into the medical care at EBRPP, noting that "the council already knows about numerous problems" including understaffing, medical equipment shortages, and insufficient compensation for medical professionals;

    d. Also in October of 2015, Defendant GAUTREAUX was cited as requesting a new jail "for years" and that "officials long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . mentally ill who are booked";

    e. In February 2016, Defendant GAUTREAUX's spokesperson was reported to acknowledge that Tyrin's death proves that EBRPP is not

safe for either EBRPP deputies or inmates. Casey Rayborn Hicks noted that Defendant GAUTREAUX "proposed in a new facility . . . a layout that has more visibility for deputies [and] surveillance cameras."

(Doc. 40 at ¶ 80). Additionally, Plaintiffs' Complaint cites to media reports concerning the reported significant decline in the quality of health care at the EBRPP, and to instances where Sheriff Gautreaux and Warden Grimes advocated for a new jail to address problems previously discussed. (*Id.* at ¶ 82).

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

"[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Hence, the complaint need not set out "detailed factual allegations," but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555. When conducting its inquiry, the Court

"accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

## III. DISCUSSION

### A. Plaintiffs' § 1983 Official Capacity Claims

*Applicable Law – Monell Liability*

"Although municipalities [and government officials] cannot be held liable under section 1983 by virtue of the doctrine of respondeat superior, they are subject to such liability where official custom or policy is involved in the injury." *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985)); *see also Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978). Specifically, municipal liability under § 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (internal quotation marks omitted). The policymaker must have actual or constructive knowledge of the official policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). The Court of Appeals for the Fifth Circuit has held:

> Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808–09 (5th Cir. 2017) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)).

Furthermore, "*Monell* liability can occur in a variety of ways, one of which is by 'systematic maladministration of the laws.'" *O'Quinn*, 773 F.2d at 608 (quoting *Bennett*, 728 F.2d at 768). The Fifth Circuit "has repeatedly held that municipalities or supervisors may face liability under section 1983 where they breach duties imposed by state or local law." *Id.* at 608–09.

### 1. EBR, Counts 1, 2, 3, and 6.

Counts 1, 3, and 6 allege § 1983 *Monell* violations against EBR based on a "*de facto* policy*" as evidenced by the "extended" and "pervasive" misconduct of EBRPP staff, and the establishment of a system of policies, patterns, or practices where Colbert was denied access to appropriate medical care. (Doc. 40 at pp. 22, 24, 27). Count 2 alleges a § 1983 violation based on "unconstitutional conditions of confinement." (Doc. 40 at p. 23). For the reasons fully explained below, **all Counts remain in this action, with respect to EBR.**

> a. *Monell* Violation – Policies, Patterns or Practices and
> Conditions of Confinement: Counts 1, 2, 3 and 6.

In *O'Quinn*, the Fifth Circuit summarized the parish's duties under state law to "fund and maintain" prisons as follows:

Under Louisiana law, the Police Jury had no responsibility over the daily operation of the Jail. However, state law does require the Police Jury to "provide . . . a good and sufficient jail," La. Rev. Stat. Ann. §33:4715 (West 1966), [and] to be "responsible for the physical maintenance of all parish jails and prisons," *id.* § 15:702 (West 1981) . . . ." (citations omitted). [T]he police jury "is responsible for the expenses of establishing, maintaining and operating the jail and for all

10

expenses of feeding, clothing, and providing medical treatment to the prisoners while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed." [*Amiss*, 411 So.2d at 1141.]

773 F.2d at 609. Therefore, it is clear that EBR may be liable where Plaintiffs have alleged that EBR failed in the performance of its duty to provide funding for healthcare or to physically maintain the jail. Furthermore, conditions of confinement claims may also be brought against a parish for its failure to provide adequate funding. *See Arce v. Louisiana*, 226 F. Supp. 3d 643, 649–50 (E.D. La. 2016) (If allegations of jail deficiency implicate a parish's responsibility to finance and physically maintain the jail, then the parish is a proper defendant, but if the responsibilities are not implicated, the claim against the parish cannot proceed). Nevertheless, "[w]here a municipal body is vested with this sort of fiscal obligation to a jail, its liability for insufficient funding or maintenance will depend on its knowledge of conditions at the jail." *O'Quinn*, 773 F.2d at 609. Plaintiffs allege actual and constructive knowledge on the part of EBR's policymaker of the above violations.

Plaintiffs expressly pleaded that EBR violated its duty to fund and physically maintain the prison. Specifically, the Complaint provides that "Defendants [EBR] failed to provide sufficient funding and oversight to all Defendants, resulting in unconstitutional conditions of confinement at the EBRPP. [EBR's] explicit policy of not sufficiently funding and overseeing EBRPP caused defects in physical design and manner of operation." (Doc. 40 at ¶ 79). In an effort to assert further liability against EBR, Plaintiffs make numerous references to a study commissioned by EBR with HMA, for the purpose of assessing clinical operations in medical services being

11

provided at the prison.[4] (Doc. 40 at ¶¶ 45–69). HMA found that EBR underfunds the medical and mental health program at the EBRPP. (Doc. 40 at ¶ 47). Moreover, HMA recommended that the budget be "doubled." (*Id.*). The HMA study further claims, that the two infirmary rooms were "infirmaries' in name only" as they were not adequate or within sightlines, M01 and N01 provided a "woefully inadequate physical environment," and there was a lack of mental health programing due to inadequate staffing and lack of available rooms. (*Id.* at ¶¶ 50, 52, 54, 58). These allegations are more specific than mere legal conclusions, and state a plausible claim for relief.

Furthermore, Plaintiffs have pleaded with specificity that EBR's policymakers had actual or constructive knowledge of the problems at the jail. For instance, "[i]n October of 2015, a Baton Rouge elected official complained of a study into the medical care at EBRPP, noting that 'the council already knows about numerous problems' including understaffing, medical equipment shortages, and insufficient compensation for medical professionals." (Doc. 40 at ¶ 80). Construing these facts in a light most favorable to Plaintiff, the Court finds that this statement specifically sets forth actual or constructive knowledge of the understaffing and underfunding of the EBRPP by EBR's policymaker, the parish council.

Accordingly, the Court finds that Plaintiffs have adequately alleged a *Monell* claim against the EBR. The Court finds that Plaintiffs have plausibly pleaded that

---

[4] The Court of Appeals for the Fifth Circuit has relied on an HMA report in upholding a jury verdict in favor of a pretrial detainee who suffered a stroke and permanent disability due to the failure of the jail to administer his medication, which was found to be the predictable result of a *de facto* policy that denied inmates adequate healthcare. *Shepherd v. Dallas County*, 591 F.3d 445, 450–51 (5th Cir. 2009) ("Two extensive reports entered into evidence buttressed [detainee's] claims," the HMA report and one by the Department of Justice regarding the jail's conditions).

EBR breached its duty to fund and maintain the jail, that the jail was physically deficient and underfunded, and that EBR had knowledge of such inadequacies. The Complaint also shows how these violations were the moving force of constitutional harm to Plaintiffs because had the prison been adequately funded and staffed with health care and security professionals, it is plausible that Colbert would not have suffered from his medical and mental health issues, namely, broken bones, unprecedented psychotic episodes, and he may not have been murdered.

### i. Conditions of Confinement: Count 2

In a condition of confinement claim, a pretrial detainee challenges the jail's general conditions, practices, rules, or restrictions as unconstitutional. *Duvall v. Dall. Cnty., Tex.,* 631 F.3d 203, 207 (5th Cir. 2011). To prevail in a constitutional claim challenging a condition of confinement, the detainee must prove (1) a rule or restriction, or identifiable intended condition or practice, or a jail official's acts or omissions that were "sufficiently extended or pervasive," which was (2) not reasonably related to a legitimate government objective, and which (3) caused the violation of the detainee's constitutional rights. *Id.* The Fifth Circuit has explained that "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Id.*; (quoting *Hare v. City of Corinth,* 74 F.3d 633, 644 (5th Cir. 1996) (en banc)). In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a

pattern of acts or omissions so extended or pervasive to prove an intended condition or practice. *Id.* (citations omitted).

Here, Plaintiffs allege a series of unresolved, systemic deficiencies sufficient for the Court to infer the existence of a *de facto* policy of failing to adequately fund the EPRPP and to adequately treat pretrial detainees with mental illnesses. *See Shepherd v. Dallas County,* 591 F.3d 445, 453 (5th Cir. 2009) ("From this evidence, the court could reasonable infer a *de facto* jail policy of failing properly to treat inmates with chronic illness."). Plaintiffs allege continuing deficiencies in policies and practices at the prison related to the physical jail facility itself, including "defects in physical design and manner of operation, inadequate staffing, inadequate supervision techniques, poor sightlines," and the layout of the prison, which makes it difficult to adequately monitor prisoner living areas. (Doc. 40 at ¶ 90). Plaintiffs further aver that Defendants failed to appropriately address these deficiencies in policies and practices, despite having knowledge of them by continuing to underfund and understaff the prison. (Doc. 40 at ¶¶ 80–82).

Plaintiffs also provide an example of a legitimate governmental objective that is likely thwarted by Defendants' failure to provide "a good and sufficient jail," and to properly finance the prison's health care program by alleging that the policies and practices that allow suicidal and mentally ill prisoners to be housed in solitary confinement, "not only denies necessary treatment, [but also] exacerbates the prisoners' condition and causes unnecessary pain and suffering." (Doc. 40 at ¶ 76).

Lastly, Plaintiffs allege a constitutional injury caused to the detainee by Defendants that is sufficient to support a condition of confinement claim. The Complaint provides that Colbert suffered a constitutional injury because while he was in the care and custody of Defendants, he became suicidal and psychotic, he was anxious and unable to sleep, his arm was broken without receiving medical attention for approximately five days, and he was ultimately murdered by his cellmate. (Doc. 40 at ¶¶ 40). Therefore, Defendants' motion regarding counts 1, 2, 3, and 6 is DENIED.

## 2. Director Rintha Simpson and PMS, Counts 3 and 6.

Counts 3 and 6 allege § 1983 *Monell* violations against PMS and Director Simpson based on the establishment of a system of policies, patterns, or practices where Colbert was denied access to appropriate medical care. (Doc. 40 at pp. 24, 27). For the reasons fully explained below, **all Counts remain in this action, with respect to PMS and Director Simpson**.

### a. Medical Review Panel

The Court will first address Defendants' contention that Plaintiffs' claims are premature because, under the Louisiana Medical Malpractice Act, La. Rev. Stat. 40:1299.41, *et seq.*, such claims may not be brought against a qualified health care provider until the claim has been presented for review before a medical review panel pursuant to § 40:1299.47, which Plaintiffs have not done. (Doc. 43-1 at p. 8). However, Plaintiffs' claim of deliberate medical indifference under the Fourteenth Amendment asserts a claim based on the violation of constitutional civil rights under 42 U.S.C. §

1983, and therefore the Louisiana Medical Malpractice Act does not apply. *See Bailey v. E.B.R. Parish Prison*, 2015 WL 545706, at *3 (M.D. La. Feb. 9, 2015); *Parish v. Lee*, 2004 WL 877103, *13 (E.D. La. April 22, 2004) (finding that an inmate plaintiff "is not required to present his § 1983 claims of *intentional* indifference to a medical review panel"); *Thomas v. James*, 809 F.Supp. 448 (W.D. La. 1993). Therefore, Defendants' Motion to Dismiss is DENIED.

> b. *Monell* Violations – Policies, Patterns, or Practices and the Denial of Access to Appropriate Medical Care: Counts 3 and 6.

Defendants further argue that "[EBR], PMS, and [Director] Simpson have *nothing to do* with the operation of the Parish Prison." (Doc. 43-1 at p. 17) (emphasis added). "Pursuant to La. Rev. Stat. § 15:703, the parish governing authority is responsible for ensuring that the jail has a health care provider, and for funding the prisoners' medical care[.] However, the sheriff is responsible for overseeing how the medical care is provided because he controls the inmates of the jail, its employees, and its daily operations." *Serigny v. Lafourche Par. Gov't ex rel. Charlotte Randolph Par. Pres.*, 2012 WL 3548029, at *3 (E.D. La. Aug. 16, 2012), *aff'd*, 547 F. App'x 582 (5th Cir. 2013). In addition, "[i]n lieu of appointing a physician, the governing authority of any parish may enter into a contract with a health care provider, licensed or regulated by the laws of this state, to provide requisite health care services, as required in this Section." *Id.* § 15:703(B).

Here, EBR has, by contract, delegated responsibility for providing medical and mental health services to prisoners at the EBRPP to PMS, which is therefore

responsible for the provision of all staffing, training, policies, and procedures for medical and mental health personnel at the EBRPP. *Id.* § 15:703(D). Plaintiffs allege that PMS and Director Simpson failed to provide Colbert sufficient access to quality medical and mental health care, which resulted in both explicit and *de facto* policies and practices that house suicidal and mentally ill prisoners in solitary confinement. (Doc. 43-1 at p. 2). Further, Plaintiffs have alleged that Director Simpson was fully aware of the alleged deficiencies in the health care program at the EPRPP as evidenced by the study conducted by HMA in which Director Simpson was interviewed. (Doc. 40 at ¶ 46). Nonetheless, Director Simpson has been sued only in her official capacity as "Healthcare Director" of PMS. (Doc. 40 at pp. 24, 27).

Specifically, Plaintiffs' Complaint alleges that during the month of November 2015, Colbert's mental health evaluations were conducted "through the bars of [his] cell," and the doctor could not ascertain whether Colbert was "psychotic" or "malingering," but still prescribed him antipsychotic medication. (Doc. 40 at ¶¶ 16–26). Further, PMS allegedly failed to set Colbert's follow-up appointment after his arm was broken, nor did PMS transport Colbert to the hospital, despite numerous "scheduled medical call outs." (*Id.* at ¶¶ 30–31). Therefore, the motion to dismiss with respect to PMS and Director Simpson is DENIED.

### 3. Sheriff Gautreaux, Counts 1, 2, 3, 4, and 6; and Warden Grimes, Counts 1, 2, and 4.

Counts 1, 3, and 6 allege § 1983 *Monell* violations against Sheriff Gautreaux and/or Warden Grimes based on a "*de facto* policy" as evidenced by the "extended" and "pervasive" misconduct of EBRPP staff, and the establishment of a system of

policies, patterns, or practices where Colbert was denied access to appropriate medical care. (Doc. 40 at pp. 22, 24, 27). Count 2 alleges a § 1983 violation based on "unconstitutional conditions of confinement." (Doc. 40 at p. 23). Count 4 alleges that the § 1983 violation is also based on "failure to supervise" to ensure Colbert received appropriate care for his alleged medical needs. (Doc. 40 at p. 25). For the reasons fully explained below **Count 4 is dismissed, with respect to Sheriff Gautreaux and Warden Grimes. Counts 1, 2, 3, and 6 remain in this action, with respect to Sheriff Gautreaux and/or Warden Grimes**.

> a. *Monell* Violation – Policies, Patterns, or Practices: Counts 1 and 6.

Municipal officials, such as Sherriff Gautreaux and Warden Grimes, may be held liable in their official capacity under § 1983. As stated above, a plaintiff must demonstrate that the defendant is a policymaker who has actual or constructive knowledge of an official policy or custom, and that there was a violation of constitutional rights whose moving force is the policy or custom. *Pineda*, 291 F.3d at 328 (citing *Piotrowski*, 237 F.3d at 578). Defendants argue that Plaintiffs have not identified an official policy, which was the moving force behind any constitutional violation in this case. (Doc. 61-1). Defendants assert that Plaintiffs merely make conclusory allegations of practices or customs. (*Id.*).

Turning to the first element, "a policymaker" is an official who has final policy making decision power. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Neither Defendants concede to being (or not being) a "final policymaker." (*see* Docs. 61, 70). However, Sheriff Gautreaux and Warden Grimes are named "final

policymakers," in Plaintiffs' Complaint. (Doc. 40 at ¶¶ 4–5). Sheriff Gautreaux is considered a "final policymaker" under Louisiana law. *See Craig v. St. Martin Parish Sheriff*, 861 F.Supp. 1290, 1301 (W.D. La. 1994); La. Const. art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish."). Likewise, Warden Grimes is considered a "final policymaker" for the EBRPP. *See Parker v. Gautreaux*, 2014 WL 4185296, at *4 (M.D. La. Aug. 21, 2014). Thus, both appear to be a policymaker for the EPRPP.

Under the second element, Plaintiffs must demonstrate that the unconstitutional conduct arises from a specific policy or custom and that the policymaker had actual or constructive knowledge of the official policy or custom. A policy is normally an official statement, ordinance, or regulation, but in certain circumstances a persistent, widespread practice that is so commonplace as to constitute a custom can also be treated as policy. *See Piotrowski*, 237 F.3d at 579. In the context of an alleged failure to provide adequate medical care, "the existence of a constitutionally deficient policy cannot be inferred from a single wrongful act." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). Plaintiffs must show either that "the jail's treatment system had . . . failed to deliver necessary and appropriate medical care" to other inmates or that the supervisor was deliberately indifferent to the fact "that the policy would expose prisoners to substantial risk of significantly unmet serious medical needs." *Id.* Deliberate indifference is a stringent standard that requires Plaintiffs to establish (1) that the officer was aware of facts from which

a substantial risk of serious harm could have been inferred and (2) that the officer actually drew the inference. *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015).

Here, because Plaintiffs do not claim the existence of a written policy, Plaintiffs must demonstrate that the alleged patterns and practices were so widespread and persistent as to constitute a custom. The Court finds that Plaintiffs have alleged facts sufficient to raise a plausible inference that the purported violations of Plaintiffs' constitutional rights amounted to a custom or practice. For instance, Plaintiffs have claimed, *inter alia*, that other inmates suffered from a similar practice of inadequacies in receiving adequate medical and mental health care. (Doc. 40 at ¶ 80). Plaintiffs have also asserted that at least four other inmates have suffered and ultimately died at the prison due to inadequate medical and mental health care. (*Id.*). However, the Court notes that although Colbert may have suffered medical and mental health issues while detained, his death was at the hands of another inmate and not due to his medical or mental health. Lastly, Plaintiffs also assert that there is a pattern in the lack of monitoring of Colbert, as well as other inmates, due to the layout of the prison and the cells being out of sightlines. (*Id.*). Therefore, Plaintiffs have pleaded a plausible claim for unconstitutional polices or practices.

Defendants assert that Plaintiffs do not allege any facts to show that Sheriff Gautreaux or Warden Grimes had actual or constructive knowledge of any alleged practices or customs that allegedly violated Colbert's constitutional rights. (Doc. 16-1 at p. 12). Nevertheless, Plaintiffs make allegations which, when construed in a light most favorable to Plaintiffs, may show knowledge by Sheriff Gautreaux and

Warden Grimes of violations of Colbert's constitutional rights. For example:

- In February of 2015, Warden Grimes publically acknowledged that cell doors do not open and shut due to rust, the layout of the prison makes it difficult to monitor prisoners, and there is overpopulation.
- In October of 2015, Sheriff Gautreaux was cited as requesting a new jail "for years" and that "officials long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . mentally ill who are booked."
- In February 2016, Sheriff Gautreaux's spokesperson acknowledged that Colbert's death proves that EBRPP is not safe for either EBRPP deputies or inmates; and that Sheriff Gautreaux "proposed in a new facility . . . a layout that has more visibility for deputies [and] surveillance cameras."

(Doc. 40 at ¶ 80). Plaintiffs also point to "media reports" subsequent to Colbert's death that quote professionals who note a "significant decline in the quality of care . . . over the past six or seven years, crucial health conditions at the prison, and chronic understaffing." (Doc. 40 at ¶ 67). Lastly, the Complaint alleges that since 2014, Sheriff Gautreaux and Warden Grimes, "have advocated for a new jail to address what they recognize are widespread problems with the current jail, including that the layout of the jail makes it difficult to monitor prisoners, substandard medical and mental health care, and understaffing." (Doc. 40 at ¶ 82).

The Complaint also shows how these violations were the moving force of constitutional harm because Plaintiffs properly pleaded facts that demonstrate that, at the very least, the lack of adequate health care, understaffing, and conditions of the prison, show that Sheriff Gautreaux and Warden Grimes' deliberate indifference was highly likely to lead to inadequate monitoring, and the specific injuries suffered by Colbert. Accordingly, the Court finds that Plaintiffs have adequately alleged a *Monell* claim.

21

b.  Denial of Access to Appropriate Medical Care (Sheriff Gautreaux): Count 3

As stated above, the sheriff is responsible for overseeing how the medical care is provided because he controls the inmates of the jail, its employees, and its daily operations. *See Serigny,* 2012 WL 3548029, at *3. Furthermore, under Louisiana law, it is the sheriff and not the municipality that has the duty to provide day-to-day medical care of the prisoners; however, the municipality is responsible for appointing a physician. *Howard v. City of New Orleans,* 1988 WL 98242, at *1 (E.D. La. Sept. 9, 1988).

Here, Defendants assert that Plaintiffs' conclusory allegations that Sheriff Gautreaux established and maintained policies, patterns or practices that provided inadequate and insufficient services for medical and mental health care do not amount to deliberate indifference. (Doc. 61-1 at p. 21). Plaintiffs allege that Sheriff Gautreaux knew that the medical and mental health services were inadequate and insufficient, which resulted in the deprivation of such services for prisoners with serious medical conditions, namely, broken bones, and serious mental health conditions, including unprecedented psychotic episodes. (Doc. 40 at ¶ 97). As a result, Defendants' motion is DENIED.

c.  *Monell* violation – Conditions of Confinement: Count 2

With respect to the conditions of confinement claims against Sheriff Gautreaux and Warden Grimes, the analysis is similar to that of the EBR. Plaintiffs allege a series of unresolved, systemic deficiencies sufficient for the Court to infer the existence of a *de facto* policy of failing to adequately monitor, supervise, and protect

22

prisoners; provide adequate medical and mental health care; and to treat pretrial detainees who are diagnosed with mental illnesses. Plaintiffs further aver that Defendants were deliberately indifferent because they failed to appropriately address these deficiencies despite having knowledge of them. (Doc. 40 at ¶¶ 80–82).

Additionally, the Complaint plausibly states that Sheriff Gautreaux and Warden Grimes' alleged *de facto* policies are not reasonably related to a legitimate government objective, such as to treat the mentally ill to avoid exacerbation of the condition. Lastly, Plaintiffs properly allege a constitutional injury caused to Colbert that is sufficient to support a condition of confinement claim. It is alleged that while Colbert was in the care and custody of Defendants, he became suicidal, began hearing voices, became anxious and was unable to sleep, had his arm broken without receiving medical attention for approximately five days, and was ultimately murdered by his cellmate as a result of Defendants' failure to provide adequate mental health care, failure to properly monitor the cells, and the lack of sightlines in the prison. (Doc. 40 at ¶¶ 40). As a result, the Defendants' motion regarding conditions of confinement is DENIED.

d. Liability under § 1983 for Failure to Supervise: Count 4

Plaintiffs allege that Sheriff Gautreaux and Warden Grimes are liable in their individual and official capacities for failure to supervise and train their subordinates. (Doc. 40 at p. 25). Specifically, Plaintiffs allege that Sheriff Gautreaux and Warden Grimes failed to ensure that their subordinates did not ignore prisoners' requests for medical and mental health treatment, failed to refer prisoners needing treatment to

appropriate mental health professionals, and failed to properly monitor prisoners who are at risk of being sexually and physically abused by other prisoners. (Doc. 40 at ¶ 100). However, Defendants contend that Plaintiffs have failed to allege facts to show any wrongful conduct by Sheriff Gautreaux or Warden Grimes in their roles as supervisors in this case. (Doc. 61-1 at p. 4). Defendants argue that neither the employees of PMS, who provided medical care to inmates, nor the doctors contracted by EBR to provide medical care, are employees or subordinates of Sheriff Gautreaux or Warden Grimes. (*Id.* at p. 11).

When alleging a failure to train or supervise, Plaintiffs "must show that '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)). In all but the most exceptional of circumstances, a failure-to-train claim requires a pattern of similar occurrences. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Plaintiffs' claims for failure to train or supervise must fail. Plaintiffs do not specify how the prison's training was inadequate. Plaintiffs have failed to allege facts to show that Sheriff Gautreaux or Warden Grimes failed to supervise their employees. In addition, Plaintiffs do not allege any foundational facts from which it can be plausibly inferred that Defendants provided inadequate training or

supervision, or that they were aware that current training practices were likely to result in a constitutional violation. The examples provided in paragraph 80 of the Complaint do not indicate knowledge nor a pattern of inadequate training or supervision of security staff. (Doc. 40 at ¶ 80). Plaintiffs allege that they were "*directly harmed* by this failure to supervise because it caused the death of [Colbert], who was at times left untreated and when treated received patently insufficient treatment for his serious medical and mental health needs." (Doc. 40 at ¶ 100) (emphasis added).

However, Plaintiffs do not allege any facts to show that any failure to supervise security staff by Sheriff Gautreaux or Warden Grimes was the cause of Colbert being left untreated or allegedly receiving insufficient medical or mental health treatment. Further, Plaintiffs do not explain how the alleged failure to receive adequate medical or mental health treatment caused Colbert's death, which was at the hands of another inmate. Indeed, Plaintiffs' Complaint demonstrates that Defendants' deputies did not ignore Colbert's requests for medical and mental health treatment, and they, in fact, referred Colbert to PMS when he needed mental healthcare. (Doc. 40 at ¶¶ 16–35). Without more specific allegations regarding the behavior of subordinates at the prison, the treatment of other inmates, or the training policies in place, the Court cannot simply assume that prison staff were inadequately trained. Accordingly, Plaintiffs' claims of failure to train and supervise are DISMISSED.

#### 4. *Sargent Grant and Sargent Cage, Count 1.*

Count 1 alleges a § 1983 *Monell* violation against Sargent Grant and Sargent Cage based on a *"de facto* policy" as evidenced by the "extended" and "pervasive" misconduct of EBRPP staff. (Doc. 40 at p. 22). For the reasons fully explained below, **Count 1 is dismissed, with respect to Sargent Grant and Sargent Cage**.

As previously provided, to be liable in one's official capacity under § 1983, Defendants Sargent Grant and Sargent Cage must be "final policymakers" in connection with the particular policies or customs at issue. Plaintiffs allege that Sargent Grant and Sargent Cage were acting at all times as final policymakers, having been delegated the authority to do so by Sheriff Gautreaux and Warden Grimes. (Doc. 40 at ¶¶ 10–11). Defendants argue that as East Baton Rouge Parish Sheriff deputies, under state law, Sargent Cage and Sargent Grant are not final policymakers for the EBRPP, and Plaintiffs have not alleged facts demonstrating that such authority was ever delegated to them. (Doc. 56-1 at p. 16).

The determination of whether an official has final policymaking authority is a legal question controlled by state or local law. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Worsham v. City of Pasadena*, 881 F.2d 1336, 1340–41 (5th Cir. 1989). Merely granting an employee some discretionary authority does not make the employee a final policymaker. *See City of St. Louis v. Prapotnik*, 485 U.S. 112 (1988); *Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1246–47 (5th Cir. 1993). Under Louisiana law, it is clear that "the Sheriff in his official capacity is the appropriate governmental entity responsible for any constitutional violations committed by his

26

office." *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d 606, 614 (E.D. La. 1998) (citations omitted). Therefore, Sargent Grant and Sargent Cage are not final policymakers. Accordingly, Defendants' motion to dismiss the *Monell* claims against Sargent Grant and Sargent Cage is GRANTED.

## B. Plaintiffs' § 1983 Individual Capacity Claims

Plaintiffs suing governmental officials in their individual capacities, must allege specific conduct giving rise to a constitutional violation. *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). Plaintiffs "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 556 U.S. at 676. Vicarious liability is inapplicable to § 1983 actions. *Id.* In other words, an official must be personally involved in a constitutional violation to state a claim for relief.

Qualified immunity also shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a qualified immunity defense, a plaintiff must allege a violation of a constitutional right and show that "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). And yet, "[e]ven if the government official's conduct violates a clearly established right, the official is entitled to immunity if his conduct was objectively reasonable." *Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008). It is well-established within the Fifth Circuit that

"[w]hen a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

## 1. *Sheriff Gautreaux and Warden Grimes, Count 4.*

Count 4 alleges that, in their individual capacities, Sheriff Gautreaux and Warden Grimes violated § 1983 and did so based on the "failure to supervise" their subordinates to ensure that Colbert received adequate medical and mental health care, and that inmates such as Colbert are properly monitored. (Doc. 40 at ¶ 100). For the reasons fully explained below, **Count 4 is dismissed**.

The Court previously determined that Plaintiffs' failure to supervise claim against Sheriff Gautreaux and Warden Grimes, in their official capacities, be dismissed. As previously stated in the Court's ruling on the official capacity claim asserted against Sheriff Gautreaux and Warden Grimes, Plaintiffs do not allege any foundational facts from which it can be plausibly inferred that Defendants provided inadequate training or supervision, or that they were aware that current training practices were likely to result in a constitutional violation. Further, Sheriff Gautreaux and Warden Grimes are entitled to the defense of qualified immunity on the individual capacity claims for failure to supervise because Plaintiffs have not plausibly pleaded that their alleged failure to train or supervise was objectively unreasonable in light of the requirement not to be deliberately indifferent to Colbert's rights. Therefore, Defendants' motion to dismiss the individual capacity claim asserted in Count 4 is GRANTED.

## 2. *Sargent Grant and Sargent Cage, Count 7.*

Count 7 of the complaint alleges that, in their individual capacities, Sargent Grant and Sargent Cage violated § 1983 on the basis of "a specific act or omission," which resulted in the injury and death of Colbert. (Doc. 40 at p. 28). For the reasons fully explained below, **Count 7 is dismissed with respect to Sargent Grant and Sargent Cage**.

Defendants contend that Plaintiffs do not allege specific facts of any personal involvement by Sargent Grant or Sargent Cage in any alleged violation of Colbert's constitutional rights. (Doc. 56-1 at p. 5). Plaintiffs allege that Sargent Grant and Sargent Cage are liable in their individual capacities for violating Colbert's Fourteenth Amendment rights "by misclassifying [Colbert], placing him in a small cell with a more violent and dangerous prisoner, failing to monitor the cell and living unit, falsifying official logbooks to indicate that they did monitor the cell and living unit, denying [Colbert] access [to] mental health care, and when providing medical care, doing so in an unconstitutional manner." (Doc. 40 at ¶ 112). However, the only foundational facts alleged in the Complaint regarding Sargent Grant and Sargent Cages' involvement with Colbert are that "[n]o EBRPP security staff was assigned to monitor the juvenile wing on February 17, 2016. Defendants S. GRANT and J. CAGE failed to ensure that the wing was adequately monitored." (Doc. 40 at ¶ 41). And that "Defendants . . . GRANT and CAGE failed to ensure staff was assigned to the juvenile wing and ensure that prisoners on the juvenile wing, including [Colbert], were protected on the day of February 17, 2016." (Doc. 40 at ¶ 74).

Plaintiffs do not allege that Sargent Grant or Sargent Cage were the deputies assigned to actually monitor Colbert's cell or living area. Plaintiffs do not allege that either Sargent Grant or Sargent Cage was responsible for classifying Colbert or placing him in the cell with Thomas. Plaintiffs do not allege any facts to suggest that either Sargent Grant or Sargent Cage falsified official logbooks to indicate that they monitored Colbert's cell or living area. Finally, Plaintiffs fail to make any factual allegation that Sargent Cage or Sargent Grant were personally involved in providing medical or mental health care to Colbert or were even aware of any alleged deficiencies in the provision of mental or medical care to Colbert. Thus, Plaintiffs have not plausibly pleaded that Sargent Grant and Sargent Cage were personally involved or had knowledge of the alleged violations; especially considering that Plaintiffs mention other Sheriff's deputies that played more substantial roles in monitoring Colbert. (Doc. 40 at ¶¶ 27, 28, 33). Therefore, Plaintiffs' allegations are insufficient to defeat Sargent Grant and Sargent Cages' defense of qualified immunity as to Plaintiffs' individual capacity claims. Accordingly, Defendants' motion to dismiss the individual capacity claim asserted in Count 7 is GRANTED.

## C. State Law Claims

All Defendants' sole basis for dismissing the state law claims are that, if the Court dismisses the federal claims, it should decline to exercise its pendant jurisdiction over the state law claims. (Doc. 43-1 at p. 18; Doc. 61-1 at p. 22; Doc. 56-1 at p. 17). Given the Court's ruling, the Court will reject this argument and deny Defendants' motion as to the state law claims with respect to the parties that remain

in this matter. However, the Court grants Sargent Grant and Sargent Cages' motion as to the state law claims because Plaintiffs have not plausibly pleaded that Sargent Grant or Sargent Cage are liable for the alleged federal violations.

### D. Punitive Damages

Plaintiffs assert that "[a]ll of the Defendants are liable to the Plaintiffs for compensatory and punitive damages." (Doc. 40 at ¶ 85). However, it is well settled that § 1983 does not allow recovery of punitive damages against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270-71 (1981). Furthermore, a § 1983 claim against a Louisiana sheriff in his official capacity "is 'in essence' a suit against a municipality." *Brown v. Strain*, 663 F.3d 245, 251 (5th Cir. 2011) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)). Punitive damages are only recoverable against municipal employees sued in their individual capacities. *Smith v. Wade*, 461 U.S. 30, 35 (1983). Therefore, Plaintiff is barred from recovering punitive damages against any Defendant acting in his official capacity.

Here, all individual capacity claims have been dismissed. Accordingly, this Court finds that Plaintiffs do not have valid claims for punitive damages against the EBR, PMS, Director Simpson, Sheriff Gautreaux, or Warden Grimes. Therefore, Plaintiffs' claims for punitive damages are DISMISSED.

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the Motions to Dismiss concerning Plaintiff's original complaint (Docs. 18, 22) are **DISMISSED AS MOOT**.

**IT IS FURTHER ORDERED** that the **Motion to Dismiss (Doc. 61)** filed by Defendants, Sheriff Sid J. Gautreaux, III, and Warden Dennis Grimes is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the **Motion to Dismiss (Doc. 43)** filed by Defendants, City of Baton Rouge/Parish of East Baton Rouge, Prison Medical Services, and Interim Director Rintha Simpson is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the **Motion to Dismiss (Doc. 56)** filed by Defendants, Sargent S. Grant and Sargent J. Cage is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' claim for punitive damages is **DISMISSED**.

Baton Rouge, Louisiana, this 8th day of January, 2018.

BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA