UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


HOSEY COLBERT, ET AL.                                    CIVIL ACTION

VERSUS

CITY OF BATON ROUGE/
PARISH OF EAST BATON ROUGE, ET AL.          NO.: 17-00028-BAJ-RLB


RULING AND ORDER

Before the Court is the **Motion to Dismiss (Doc. 68)** filed by Defendant, Dr. Robert Blanche ("Dr. Blanche") and the **Motion to Dismiss (Doc. 71)** filed by Defendant, Dr. Charlie H. Bridges ("Dr. Bridges") seeking dismissal of claims brought by Plaintiffs, Hosey Colbert and Shantita Colbert ("Plaintiffs") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiffs filed an Opposition to each Motion to Dismiss. (Docs. 78, 80). The Court has jurisdiction under 28 U.S.C. §1331. Oral argument is not necessary. For the following reasons, the **Motion to Dismiss (Doc. 68)** filed by Dr. Blanche is **GRANTED IN PART and DENIED IN PART**. The **Motion to Dismiss (Doc. 71)** filed by Dr. Bridges is **GRANTED IN PART and DENIED IN PART**.

I.     BACKGROUND

Plaintiffs are the parents of Tyrin Colbert ("Colbert"), their 17 year old son, who was murdered by an inmate while incarcerated as a pretrial detainee at the East Baton Rouge Parish Prison ("EBRPP"). (Doc. 40 at p. 1). On January 12, 2017,

1

Plaintiffs brought suit against, *inter alia*, City of Baton Rouge/Parish of East Baton Rouge ("EBR"), which is the political entity responsible for funding operations and maintenance of the prison; Sheriff Sid J. Gautreaux, who is responsible for running the prison; Warden Dennis Grimes, who is responsible for the day-to-day operation of the prison; Prison Medical Services ("PMS"), which is the entity responsible for administering healthcare to the inmates; Rintha Simpson, who was the Interim Director of PMS; and "J. Does," who are unknown sheriff's deputies and PMS staff. (Doc. 1 at ¶¶ 3–9).

On August 14, 2017, Plaintiffs filed a superseding First Amended Complaint ("Complaint") adding additional claims and Defendants in place of "J. Does." (Doc. 40). The additional Defendants included Dr. Bridges, who is the "EBRPP Medical Director;" Dr. Blanche, who is the psychiatrist for the mental health program at EBRPP; as well as, Sargent Grant and Sargent Cage, who are employees of the East Baton Rouge Sheriff's Office.[1] (Doc. 40 at ¶¶ 8–11).

Particularly, Plaintiffs allege that Dr. Bridges and Dr. Blanche were deliberately indifferent to the serious medical and mental health needs of Colbert, which continued until Colbert's murder. (*Id.* at ¶¶ 97, 103). Plaintiffs further allege that Dr. Bridges and Dr. Blanche's "policies, patterns or practices" violated Colbert's right to be free from punishment without due process of law under the Fourteenth Amendment and 42 U.S.C. § 1983. (*Id.*).

---

[1] The Court previously granted Sargent Grant and Sargent Cage's Motion to Dismiss, finding that Plaintiffs did not plausibly plead that Sargent Grant or Sargent Cage were liable for the alleged violations. (Doc. 82).

On January 9, 2018, the Court granted Plaintiffs' Motion for Voluntary Dismissal of State Claims (Doc. 81), which dismissed all state law claims brought against Dr. Bridges and Dr. Blanche, that is, Counts 8, 10, 11, and 12 of the First Amended Complaint. (Doc. 83). As such, Plaintiffs bring only § 1983 violations against Dr. Bridges and Dr. Blanche in their official capacities, as well as their individual capacities. (Doc. 40 at ¶¶ 96, 101).

### A. Colbert's Detention At EBRPP

Plaintiffs allege that on or about November 6, 2015, Colbert was arrested at his school,[2] and subsequently detained at the EBRPP. (Doc. 40 at ¶ 13). On November 10, 2015, Colbert allegedly reported feeling suicidal and was placed on suicide watch, where he was housed in Unit II's M01 and N01 wings.[3] (*Id*. at ¶ 16). Three days later, Colbert reported hearing voices and having hallucinations, and he informed Defendant PMS staff that he needed help. (*Id*. at ¶ 18). Plaintiffs assert that on the same day, Dr. Blanche, the prison psychiatrist, assessed Colbert "through the bars of [Colbert's] cell," and determined that Colbert was neither suicidal nor depressed and that he was manipulating prison staff. (*Id*. at ¶ 19). Dr. Blanche then allegedly ordered that the suicide watch be discontinued. (*Id*.).

On November 17, 2015, after an EBRPP deputy allegedly found Colbert rocking back and forth, talking to the wall, and shaking in his cell on the juvenile

---

[2] Neither party provided the reason for Colbert's arrest.

[3] According to Plaintiffs, EBRPP prisoners placed on suicide watch are housed in Unit II's M01 and N01 wings. Allegedly, M01 are single cells, and prisoners housed there receive no recreation or personal visits. In addition, Plaintiffs assert that M01 prisoners are locked in their cell for over twenty-three and a half hours a day. (Doc. 40 at ¶ 17).

wing, Dr. Blanche conducted another assessment "through the bars of [Colbert's] cell." (*Id.* at ¶¶ 22–23). During this assessment, Colbert allegedly informed Dr. Blanche that he had not been sleeping, and Dr. Blanche reportedly noted that Colbert "may be responding to internal stimuli," that he seemed "very anxious," that he had an "imaginary friend," and that he had lost weight due to being rushed. (*Id.* at ¶ 23). Plaintiffs assert that Dr. Blanche then prescribed Colbert several psychotropic medications, such as, "Ativan and Haldol."[4] (*Id.* at ¶¶ 23–24).

On November 24, 2015, Dr. Blanche purportedly saw Colbert during a follow-up examination, "again through the bars of [Colbert's] cell," and noted that Colbert had "IMPROVED [sic]." (*Id.* at ¶ 25). The next day, on November 25th, Colbert reported to PMS staff that he had been sexually assaulted by another prisoner. (*Id.* at ¶ 26).

On December 6, 2015, Plaintiffs claim that while Colbert was housed in Unit II's M01 cellblock, an EBRPP deputy observed Colbert put his arm into the cell and "then [he] started screaming and struggling to pull his arm out of the cell." (*Id.* at ¶ 28). Allegedly, an x-ray two days later revealed that Colbert's forearm was broken, and three days later, on December 11, 2015, Colbert was transported to the hospital. (*Id.*). The hospital purportedly required Colbert to follow up with the physician within 2–3 weeks, but no follow up appointment was made and Colbert "never saw the [physician] again." (*Id.* at ¶ 30). Plaintiffs assert that Colbert was not transported

---

[4] Ativan is a drug used to treat anxiety. Haldol is an antipsychotic drug used to treat psychotic disorders. (Doc. 40 at ¶ 24).

to any "scheduled medical call outs" within EBRPP that occurred on December 14 and 28, 2015, and January 4, 6, and 11, 2016. (*Id*. at ¶ 31).

On January 23, 2017, Colbert allegedly expressed to an EBRPP deputy that he wanted to kill himself, prompting the deputy to bring Colbert to PMS staff. (*Id*. at ¶ 33). Plaintiffs claim that when PMS staff spoke with Colbert, he "stared" and did not respond, prompting PMS staff to strip Colbert of his clothes, handcuff and shackle him, and place him in a paper gown, at which point Colbert purportedly "threw himself to the floor and bloodied his mouth" causing him to be "placed on lockdown." (*Id*. at ¶ 33). On January 27th, Colbert's scheduled appointment with a social worker was allegedly rescheduled because the social worker was out of the office. (*Id*. at ¶ 34). And on January 28th, Colbert was purportedly taken off suicide watch. (*Id*. at ¶ 35).

Thereafter, EBRPP security staff placed Colbert in a two-person cell on the juvenile wing with another 17 year old male, Kermitious Thomas ("Thomas").[5] (*Id*. at ¶ 35–36). Plaintiffs allege that on February 17, 2016, Thomas murdered Colbert, and was later convicted of the murder. (*Id*. at ¶¶ 37–38).

### *B. Medical and Mental Health Care at the EBRPP*

Defendant EBR contracted with Health Management Associates ("HMA") "to provide an assessment of the clinical operations and medical services being provided by the City Parish at the [EBRPP]." (Doc. 40 at ¶ 45). According to Plaintiffs, the

---

[5] On December 18, 2015, Plaintiffs assert that Thomas was arrested for carrying a handgun in a Gun Free Zone, resisting arrest, and illegal possession of a handgun by a juvenile. On December 29, 2015, while out on bond, Plaintiffs assert that Thomas was arrested for breaking into an apartment. Thomas has allegedly been in EBRPP since December 29, 2015. (Doc. 40 at ¶ 39).

authors of the HMA study interviewed Baton Rouge officials, including Dr. Blanche and Dr. Bridges. (*Id.* at ¶ 46). The site visit and tour of EBRPP and interviews took place in February of 2016, and the findings and recommendations were presented publicly to the Metro Council on June 8, 2016. (*Id.* at ¶ 46).

HMA found, *inter alia*, that acutely mentally ill and suicidal patients like Colbert are housed on Unit II's M01 and N01 where Dr. Blanche performs "rounds and interviews patients through the open bars due to the difficulty of moving such patients, not for a valid medical reason." (*Id.* at ¶ 53). Additionally, HMA found that M01 and N01, which is "frequently loud with inmates who are shaking bars [and] throwing feces," provided a "woefully inadequate physical environment for the most unstable mentally ill at" the EBRPP. (*Id.* at ¶ 54). HMA further found that Dr. Blanche had not provided health care staff "suicide training" in over a year, and that neither Dr. Bridges nor Dr. Blanche prepared mortality reports for the deaths of prisoners at EBRPP despite the fact that the mortality rates in the EBRPP have been substantially above the national average since 2012. (*Id.* at ¶¶ 55, 59–63).

## II.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

"[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). Hence, the complaint need not set out "detailed factual allegations," but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555. When conducting its inquiry, the Court "accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

## III.   DISCUSSION

### A. Louisiana Medical Malpractice Act

The Court will first address Defendants' contention that Plaintiffs' claims are premature because, under the Louisiana Medical Malpractice Act, La. Rev. Stat. 40:1299.41, *et seq*., such claims may not be brought against a qualified health care provider until the claim has been presented for review before a medical review panel pursuant to § 40:1299.47, which Plaintiffs have not done. However, Plaintiffs' claim of deliberate medical indifference under the Fourteenth Amendment asserts a claim based on the violation of constitutional civil rights under 42 U.S.C. § 1983, and therefore, the Louisiana Medical Malpractice Act does not apply. *See Bailey v. E.B.R.*

*Parish Prison*, 2015 WL 545706, at *3 (M.D. La. Feb. 9, 2015); *Parish v. Lee*, 2004 WL 877103, *13 (E.D. La. April 22, 2004) (finding that an inmate plaintiff "is not required to present his § 1983 claims of *intentional* indifference to a medical review panel"); *Thomas v. James*, 809 F.Supp. 448 (W.D. La. 1993). Therefore, Defendants' Motions to Dismiss are denied with respect to the medical malpractice prematurity claims.

## B. Plaintiffs' § 1983 Official Capacity Claims

Counts 3 and 5 allege § 1983 violations against Dr. Blanche and Dr. Bridges, in their official capacities, based on deliberate indifference, and the establishment of a system of policies, patterns, or practices where Colbert was denied access to appropriate medical care. (Doc. 40 at pp. 24, 26). Plaintiffs further allege that as a result of "both explicit and *de facto* policies and practices," Dr. Blanche and Dr. Bridges housed suicidal and mentally ill prisoners in solitary confinement. (Doc. 40 at ¶ 76). Plaintiffs argue that "[s]uch a practice not only denies necessary treatment, it exacerbates the prisoners' condition and causes unnecessary pain and suffering[, which] is especially true for adolescents, including [Colbert]." (*Id.*).

Plaintiffs challenge the unconstitutional treatment of Colbert under both a "conditions of confinement" theory and an "episodic act or omission" theory under the Fourteenth Amendment and § 1983. (Doc. 78 at p. 9). *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644–45 (5th Cir. 1996) (en banc)) (Section 1983 "[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'").

## 1. Section 1983 Municipal Liability

Dr. Blanche, the prison psychiatrist, argues that Plaintiffs' Complaint does not meet the pleading requirements under § 1983 because he is a physician working in a private capacity as an independent contractor to provide medical services to prisoners housed at the EBRPP; thus, he is not a state health care provider, and was not a state actor or acting under the color of state law when he provided medical treatment to Colbert. (Doc. 68-2 at p. 5). In the alternative, Dr. Blanche argues that should the Court deem him to be a state actor, he is entitled to qualified immunity because he was not deliberately indifferent to a serious medical need. (*Id.* at p. 8). The Court notes that qualified immunity is only available to Dr. Blanche as a defense to Plaintiffs' claims against him in his individual capacity, not his official capacity.

Dr. Bridges, on the other hand, argues that because he is being sued in his alleged official capacity as Medical Director at EBRPP, it is the same as a suit against the government entity for which he is employed, which means an official policy or custom must be alleged in the complaint. (Doc. 71-1 at pp. 13–14). Plaintiffs do not address whether they have plausibly pleaded an official policy or custom, rather they argue that Dr. Bridges is a final policy maker under Louisiana law. (Doc. 81 at p. 10).

Here, because Plaintiffs have alleged that both Dr. Blanche and Dr. Bridges were state actors at the time of the alleged constitutional violations,[6] the Court denies the Motions to Dismiss on this ground. However, the Court shall proceed with the alternative arguments and assess whether, as state actors, they are entitled to qualified immunity, and whether Plaintiffs have plausibly pleaded a *Monell* violation against these state actors in their official capacities.

"Although municipalities [and government officials] cannot be held liable under section 1983 by virtue of the doctrine of respondeat superior, they are subject to such liability where official custom or policy is involved in the injury." *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985)); *see also Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978). Specifically, municipal liability under § 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (internal quotation marks omitted). The policymaker must have actual or constructive knowledge of the official policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

Here, Dr. Blanche has failed to allege that Plaintiffs have not plausibly pleaded a *Monell* violation against him. In other words, Dr. Blanche has not argued

---

[6] The Court concludes that a much more fact-intensive and evidentiary-based analysis is required in order to determine whether Dr. Blanche and Dr. Bridges are state actors for purposes of 42 U.S.C. § 1983, which would be inappropriate at the Rule 12(b)(6) stage.

for a dismissal of the official capacity claims at all; therefore, his Motion to Dismiss is denied with respect to the official capacity claims. (*see* Doc. 68).

a.    Final Policy Maker

Concerning Dr. Bridges, turning to the first element, "a policymaker" is an official who has final policy making decision power. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). In the Complaint, Plaintiffs allege that Dr. Bridges "was responsible for final clinical judgments related to the treatment of prisoners . . . and [the] provision of health care at EBRPP," and that he "was a final policy maker who at times delegated policy making authority to other medical staff." (Doc. 40 at ¶ 8). Lastly, Plaintiffs allege that Dr. Bridges "acted as a final policy maker when [he] placed [Colbert] in solitary confinement and deprived [Colbert] of reasonable and adequate medical and mental health care, having been delegated the authority to do so by Defendants GAUTREAUX and GRIMES." (*Id.* at ¶ 105).

The determination of whether an official has final policymaking authority is a legal question controlled by state or local law. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Worsham v. City of Pasadena*, 881 F.2d 1336, 1340–41 (5th Cir. 1989). Merely granting an employee some discretionary authority does not make the employee a final policymaker. *See City of St. Louis v. Prapotnik*, 485 U.S. 112 (1988); *Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1246–47 (5th Cir. 1993). Under Louisiana law, it is clear that "[a] licensed physician shall be responsible for the health care program and for the practice of medicine in the institution, and no restrictions shall be placed on the medical judgment of the physician." 22 La. Admin.

Code Pt III § 2909(A). As such, the Court finds that Plaintiffs have plausibly pleaded that Dr. Bridges was responsible for final clinical judgments related to the treatment of prisoners at EBRPP; thus, they have sufficiently alleged that he is a final policy maker with respect to the provision of medical and mental health care.

b.      Official Policy or Custom

However, under the second element, Plaintiffs must demonstrate that the unconstitutional conduct arises from a specific policy or custom and that the policymaker had actual or constructive knowledge of the official policy or custom. A policy is normally an official statement, ordinance, or regulation, but in certain circumstances a persistent, widespread practice that is so commonplace as to constitute a custom can also be treated as policy. *See Piotrowski*, 237 F.3d at 579.

Here, because Plaintiffs do not claim the existence of a specific or written policy, Plaintiffs must demonstrate that the alleged patterns and practices were so widespread and persistent as to constitute a custom. The Court finds that Plaintiffs have not alleged facts sufficient to raise a plausible inference that the purported violations of Plaintiffs' constitutional rights amounted to a custom or practice. For instance, Plaintiffs have alleged that as result of "both explicit and *de facto* policies and practices," Dr. Bridges housed suicidal and mentally ill prisoners in solitary confinement, and denied Colbert access to appropriate medical care. (Doc. 40 at ¶ 76, 96). Plaintiffs have further alleged that Dr. Bridges knew that the establishment and maintenance of policies, patterns or practices that provide inadequate and insufficient services for medical and mental health

12

care would result in the deprivation of such services for prisoners with serious medical conditions, namely, broken bones and serious mental health conditions. (*Id.* at ¶ 97).

Plaintiffs must present the specific facts of other suicidal and mentally ill inmates who were housed in solitary confinement, and the specific facts regarding the alleged "inadequate and insufficient services" for inmates with serious medical and mental conditions. It is not enough to plead that there exists a custom or practice, and only discuss how Dr. Bridges directs, oversees, and staffs the health care system at EBRPP. (Doc. 80 at ¶ 14). Plaintiffs must show other instances attributable to Dr. Bridges' alleged custom of housing suicidal and mentally ill prisoners in solitary confinement and providing inadequate and insufficient health care services. Otherwise, the Court cannot infer that a persistent, widespread practice exists simply because Plaintiffs' claim that Colbert suffered serious medical conditions, namely, broken bones, and serious mental health conditions, including unprecedented psychotic episodes. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) ("Allegations of an isolated incident are not sufficient to show the existence of a custom or policy.").

Additionally, although Plaintiffs have also asserted that at least four other inmates have suffered and ultimately died at the prison due to inadequate medical and mental health care (Doc. 40 at ¶ 80), Colbert's death was at the hands of another inmate and not due to his medical or mental health. Therefore, Plaintiffs have not pleaded a plausible claim for unconstitutional polices or practices.

13

Accordingly, the Court finds that Plaintiffs have not adequately alleged a *Monell* claim against Dr. Bridges.

### c. Conditions of Confinement Theory

Because of Plaintiffs' failure to plausibly plead *Monell* liability, Plaintiffs are unable to satisfy the pleading requirements of the conditions of confinement theory. To prevail in a constitutional claim challenging a condition of confinement, the detainee must prove (1) a rule or restriction, or identifiable intended condition or practice that was "sufficiently extended or pervasive," which was (2) not reasonably related to a legitimate government objective, and which (3) caused the violation of the detainee's constitutional rights. *Duvall v. Dall. Cnty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011); *Shepherd*, 591 F.3d at 452. In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions so extended or pervasive to prove an intended condition or practice. *Id.* (quoting *Hare,* 74 F.3d at 644).

As previously determined, Plaintiffs have failed to plead that the alleged *de facto* policy, patterns, and practices were widespread and persistent; thus they have not plausibly pleaded that the practices were sufficiently extended or pervasive as to constitute a condition. *See Shepherd*, 591 F.3d at 454 ("isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."). Rather, the claims against Dr. Bridges and Dr. Blanche are better characterized under the episodic acts or omission theory because Plaintiffs complain of a particular act of, or omission by, the physicians. Specifically,

14

Plaintiffs complain of the housing of suicidal and mentally ill inmates in solitary confinement, the overseeing of a health care delivery system that had no mental health care program, the presence of barriers to health care, and insufficient health care staff.

In an effort to assert further liability against Dr. Bridges and Dr. Blanche, Plaintiffs' Complaint makes numerous references to a study commissioned by the City-Parish with HMA, for the purpose of assessing clinical operations in medical services being provided at the prison.[7] (Doc. 40 at ¶¶ 53–63). HMA found that Dr. Blanche evaluates his mentally ill patients through the open bars due to the difficulty of moving such patients; that M01 and N01, which is "frequently loud with inmates who are shaking bars [and] throwing feces," provided a "woefully inadequate physical environment for the most unstable mentally ill;" and that neither Dr. Bridges nor Dr. Blanche prepared mortality reports for the deaths of prisoners. (*Id.*). Nonetheless, detainees challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing basic human needs; a lesser showing does not demonstrate punishment in violation of the detainee's Due Process rights. *Shepherd*, 591 F.3d at 454.

---

[7] The Court of Appeals for the Fifth Circuit has relied on an HMA report in upholding a jury verdict in favor of a pretrial detainee who suffered a stroke and permanent disability due to the failure of the jail to administer his medication, which was found to be the predictable result of a *de facto* policy that denied inmates adequate healthcare. *Shepherd v. Dallas County*, 591 F.3d 445, 450–51 (5th Cir. 2009) ("Two extensive reports entered into evidence buttressed [detainee's] claims," the HMA report and one by the Department of Justice regarding the jail's conditions).

## C. Plaintiffs' § 1983 Individual Capacity Claims

Count 5 further alleges that, in their individual capacities, Dr. Blanche and Dr. Bridges violated § 1983 and did so based on deliberate indifference to Colbert's rights to appropriate medical and mental health care. (Doc. 40 at p. 26). Plaintiffs argue that Dr. Blanche and Dr. Bridges' deliberate indifference to Colbert's serious medical and mental health care needs began with his initial contact with Defendant PMS staff, and continued through his detention in EBRPP. (Doc. 40 at ¶ 78).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In assessing whether an individual is entitled to qualified immunity, the Court applies a two-part test to determine "(1) whether the defendant's alleged action is a violation of the plaintiff's constitutional rights;" and (2) if so, "whether the defendant's actions were objectively unreasonable in light of the clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007). Dr. Blanche and Dr. Bridges contend that construing the allegations in the complaint in the light most favorable to Plaintiffs, each of their alleged actions did not amount to a constitutional violation. For the following reasons, the Court agrees.

Plaintiffs claim that Dr. Blanche and Dr. Bridges were deliberately indifferent to his serious medical needs by denying him reasonable and adequate medical and

mental health care. Because Plaintiffs have complained of one or more particular acts or omissions by prison health care providers, his claims are characterized as episodic acts or omissions. *Hare*, 74 F.3d at 645. Thus, the Court will analyze the claims under the deliberate indifference standard.

Deliberate indifference is an extremely high standard to meet, one that has been equated to "'[s]ubjective recklessness,' as used in the criminal law." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 838-40 (1994)). Under this standard, a state actor may not be held liable under § 1983 unless "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 838. "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Rogers v. Boatright*, 709 F.3d 403, 409-10 (5th Cir. 2013) (quoting *Gobert v. Caldwell*, 463 F.3d 359, 346 (5th Cir. 2006)). A prisoner who alleges that he should have received additional treatment "is a classic example of a matter for medical judgment." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

To establish deliberate indifference, a plaintiff must show that an official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for

any serious medical needs." *Id.* (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). Additionally, a mere delay in providing medical treatment does not amount to a constitutional violation without both deliberate indifference and a resulting harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Accepting Plaintiffs' allegations as true, the Court finds that they have failed to state a claim of deliberate indifference to Colbert's serious medical needs against Dr. Blanche and Dr. Bridges. Based on the allegations in the Complaint, Plaintiffs did not allege that Dr. Blanche and Dr. Bridges were aware of a substantial risk of harm to Colbert, or that they purposely denied him treatment, ignored his medical complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would evince a wanton disregard for any serious medical need.

In fact, according to the allegations, Dr. Blanche examined Colbert on three occasions for his complaints related to his mental health. Dr. Blanche evaluated, assessed and/or treated Colbert on November 13, 2015, November 17, 2015, and November 24, 2015. (Doc. 40 at ¶¶ 19, 23, 25). Plaintiffs even concede that Dr. Blanche prescribed Colbert several psychotic medications. (*Id.* at ¶¶ 23–24). Based on these allegations, it appears that Dr. Blanche was quite attentive to Colbert's medical needs. Similarly, although it may have taken five days for PMS staff to transport Colbert to the hospital for his broken arm, and although Colbert was not transported to scheduled medical call outs, a mere delay in providing medical treatment does not amount to a constitutional violation without both deliberate indifference and a resulting harm.

18

Furthermore, Plaintiffs' allegations indicate that Dr. Bridges was not personally or directly involved in the administration of health care to Colbert. For the foregoing reasons, the Court finds that Plaintiffs have failed to allege facts demonstrating that Dr. Bridges and Dr. Blanche acted with deliberate indifference toward Colbert's serious medical needs in violation of the Fourteenth Amendment. Because Plaintiffs have not satisfied the first prong of the qualified immunity analysis, Dr. Bridges and Dr. Blanche are entitled to have the deliberate indifference claims against them dismissed based on qualified immunity, and each of their Motions shall be granted on this ground.

### D. Plaintiffs' Failure to Train and Supervise Claims

Plaintiffs claim that Dr. Blanche and Dr. Bridges failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP. (Doc. 40 at ¶ 77). Plaintiffs assert that as a "result of *de facto* policies and practices" permitted by Dr. Blanche and Dr. Bridges, EBRPP staff were not trained and/or supervised to address Colbert's serious medical and mental health care needs, which resulted in deliberate indifference to those needs. (*Id.*). Dr. Blanche's Motion to Dismiss failed to raise the failure to train and supervise claims; therefore, Dr. Blanche's motion is denied to the extent he moves for a dismissal on this ground. (*see* Doc. 68).

Dr. Bridges, however, argues that "Plaintiffs have failed to allege the source of [his] claimed authority or duty to train anyone." (Doc. 71-1 at p. 5). When alleging a failure to train or supervise, Plaintiffs "must show that '(1) the supervisor either

19

failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)). In all but the most exceptional of circumstances, a failure-to-train claim requires a pattern of similar occurrences. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Plaintiffs' claims for failure to train or supervise must fail. Plaintiffs do not specify how the medical staff's training was inadequate. Plaintiffs have failed to allege facts to show that Dr. Bridges failed to supervise his employees. In addition, Plaintiffs do not allege any foundational facts from which it can be plausibly inferred that Dr. Bridges provided inadequate training or supervision, or that he was aware that current training practices were likely to result in a constitutional violation. The examples provided in paragraph 80 of the Complaint[8] does not indicate knowledge nor a pattern of inadequate training or supervision of medical personnel. (Doc. 40 at ¶ 80). Furthermore, Plaintiffs do not allege any facts to show that any failure to supervise any medical personnel by Dr. Bridges was the cause of his unprecedented psychotic episodes, or the cause of his broken arm being left untreated for five days. Without more specific allegations regarding the behavior of Dr. Bridges' subordinates, the treatment of other individuals, or the training

---

[8] The Court will not list the examples; however, the Court will note that the examples include allegations that Sheriff Gautreaux and Warden Grimes had actual or constructive knowledge of the official policy or custom that caused the constitutional violations.

policies in place, the Court cannot simply assume that EBRPP medical staff was inadequately trained. Accordingly, Plaintiffs' claims of failure to train and supervise are dismissed.

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the **Motion to Dismiss (Doc. 68)** filed by Defendant, Dr. Robert Blanche is **GRANTED IN PART and DENIED IN PART**. The following claims against Dr. Blanche remain in this matter: the official capacity claim (*Monell* liability only) and the failure to supervise or train claim due to Dr. Blanche's failure to raise such claims in his motion.

**IT IS FURTHER ORDERED** that the **Motion to Dismiss (Doc. 71)** filed by Defendant, Dr. Charlie H. Bridges is **GRANTED IN PART and DENIED IN PART**. Dr. Bridges', as well as Dr. Blanche's motion, is denied with respect to the medical malpractice prematurity claims. The remaining claims in Dr. Bridges motion are granted. All claims brought by Plaintiffs against Dr. Bridges are hereby **DISMISSED WITHOUT PREJUDICE**.

Baton Rouge, Louisiana, this 15th day of May, 2018.


**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**